## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| NANCY RODRIGUEZ, | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| vs. | **Case No. 1:18-cv-115** |
| CACHE COUNTY CORPORATION, et al., | **Judge Clark Waddoups** |
| Defendants. | |

Before the court is a Motion for Summary Judgment (the "Motion") filed by defendants Cache County Corporation and Cache County Sheriff's Office (the "County") (ECF No. 55). In her Amended Complaint, plaintiff Nancy Rodriguez ("Plaintiff") asserts that the County is liable, under 42 U.S.C. § 1983 (the "1983 Claim") and a wrongful death theory (the "Wrongful Death Claim"), for the death by suicide of her husband, Jose Mena ("Mr. Mena") seventeen days after he was placed in the Cache County Jail. The County's Motion seeks summary judgment on both of those claims. The Motion has been fully briefed, and the court heard argument on the same at an April 30, 2021 hearing. The County's Motion is **GRANTED**.

## FACTS

1.      Mr. Mena was arrested on September 3, 2016, by officers of the Logan City Police Department. (*See* ECF No. 55-2.)

2.      Mr. Mena was then transported to the Cache County Jail (the "CCJ") by Logan City Police Department officers Cody Olsen and Nathan Argyle (the "Logan City Transporting Officers"). (*Id.*).

3.      When Mr. Mena arrived at the CCJ, CCJ Deputy Colton Peterson ("Deputy Peterson") completed his initial intake process.  (*Id*.).

4.      During the initial intake process, Deputy Peterson completed an intake sheet for Mr. Mena (the "Intake Sheet").  (*See id*.; see also ECF No. 55-3 at 17:8–24).

5.      In completing the Intake Sheet, Deputy Peterson asked Mr. Mena a series of questions, including whether he was suicidal.  (*See* ECF No. 55-2; ECF No. 55-3 at 17:15–24, 19:5–19, 65:8–22).  Mr. Mena reported that he was not.  (*See* ECF No. 55-2).

6.      The Logan City Transporting Officers were present while Deputy Peterson completed the Intake Sheet.  (*See* ECF No. 55-3 at 29:5–15, 70:17–24).  Although Deputy Peterson does not recall his specific interview of Mr. Mena, it was his general practice to ask the officers who had transported an inmate to the CCJ how the inmate was and whether they had anything to add.  (*See id*. at 27:23–28:10, 32:25–33:4, 39:7–14; 61:6).  Any information that was provided by the transporting officers is written down on the intake sheet.  (*See id*. at 31:11–14).

7.      Deputy Peterson generally relies on the transporting officers to share any information that they have regarding an inmate or to add any information to the answers that are being provided by the inmate.  (*See e.g.*, *id*. at 29:5–11).

8.      Deputy Peterson does not recall whether he asked the Logan City Transporting Officers any specific questions during Mr. Mena's initial intake.  (*See id*. at 28:12–14, 39:15–18).

9.      Deputy Peterson was not aware, at the time that he conducted Mr. Mena's initial intake, that Mr. Mena was suicidal.  (*See id*. at 44:10–16).  He does not recall whether the Logan City Transporting Officers represented, or informed him, that Mr. Mena presented a risk of self-harm.  (*See id*. at 58:12–59:19).  But he testified that had he received any such information, he would have "erred on the side of caution" and included it on the Intake Sheet.  (*Id*. at 59:20–24).

10.     Nothing particular about Mr. Mena or his initial intake stands out to Deputy Peterson.  (*Id*. at 61:6).

11.     After Deputy Peterson completed the initial intake of Mr. Mena, Mr. Mena's booking was handled by Deputy Cody Atwood of the CCJ ("Deputy Atwood").  (*See* ECF No. 55-9 at 29:6–14).  Deputy Atwood also performed, "to an extent" a medical screening on Mr. Mena.  (*Id*. at 34:13–25).

12.     In completing Mr. Mena's booking, Deputy Atwood had received, and relied upon, the Intake Sheet that Deputy Peterson had completed.  (*Id*. at 30:17–31:4).

13.     By the time Deputy Atwood handled Mr. Mena's booking, the Logan City Police Department officers who transported Mr. Mena had already left the CCJ.  (*See id*. at 29:2–14).

14.     Deputy Atwood had a conversation with Mr. Mena during his booking and found that he "seemed fairly happy for his circumstances."  (*See id*. at 26:22–27:9).  Deputy Atwood did not identify from Mr. Mena any depression, fatalistic comments, anxiety or fear, anger, or information concerning serious personal problems.  (*See id*. at 45:6–25).  Deputy Atwood was not aware that during Mr. Mena's booking that his family had indicated to officers of the Logan City Police Department that Mr. Mena had said he wanted to kill himself.  (*Id*. at 46:1–5).

15.     Specifically, during booking, Deputy Atwood asked Mr. Mena, among other things: "Are you currently or have you ever experienced depression or mood swings?"; "Have you ever attempted suicide or self-mutilation?" and "Are you going to harm yourself while you are here?" Mr. Mena answered all three questions in the negative.  (*See* ECF No. 55-6 at 4).

16.     Seventeen days after Mr. Mena was booked into the CCJ, on September 20, 2016, at approximately 11:00 p.m., CCJ Deputy Kylee Johnson found Mr. Mena hanging by his neck from a sheet attached to the upper bunk of his cell.  (*See* ECF No. 55-15 at 44:3–47:2).

17.    CCJ deputies provided medical care to Mr. Mena until an emergency medical crew arrived but were unable to revive him.  He was declared deceased by medical staff on September 20, 2016.  (*See* ECF No. 55-18).

18.    Mr. Mena's brother, Francisco Mena, spoke with Mr. Mena on the phone approximately three times during the seventeen days that he was incarcerated at CCJ.  (*See* ECF No 55-20 at 12:24–16:13).  Although Francisco "noticed right away that he was depressed, right at the first phone call," his conversations with Mr. Mena were ordinary, and he did not have any concerns that Mr. Mena was going to harm himself.  (*See id*.).

19.    Plaintiff spoke with Mr. Mena on the telephone while he was incarcerated.  She testifies that he reported being depressed and that harming himself had "cross[ed] his mind" but never said that he intended to do so.  (*See* ECF No. 55-14 at 12:14–21, 16:4–15, 25:23–26:2).  She did not believe that Mr. Mena would harm himself.  (*Id*. at 26:9–18). Plaintiff did not report any information regarding her conversation with Mr. Mena to the County.  (*See id*. at 12:14–21, 24:20–25:19, 26:9–18).

20.    None of the CCJ deputies who worked in Mr. Mena's area while he was incarcerated had observed any signs that indicated that Mr. Mena was experiencing depression or was likely to harm himself.  (*See* ECF No. 55 at 12, ¶ 56; ECF No. 64 at 15–16, ¶ 56).

21.    If those deputies had any concern as to Mr. Mena's mental health or became aware that he might be a risk of self-harm, it was their practice to address the situation.  (*See* ECF No. 55 at 13–14, ¶ 62; ECF No. 64 at 18, ¶ 62).

22.    At or about the time Mr. Mena was arrested, on or about September 3, 2016, officers of the Logan City Police Department had completed an officer report regarding their interaction

with, and arrest of, Mr. Mena (the "Logan City Police Department Officer Report").  (ECF No. 64-3).  The Logan City Police Department Officer Report contained the following information:

      a.     Mr. Mena had "obtained a hunting rifle and stated he was going to harm himself."  (*Id*. at 5).

      b.     After the rifle was taken from him, Mr. Mena "grabbed a knife from the kitchen and again, stated he was going to harm himself."  (*Id*.).

      c.     Plaintiff told officers that Mr. Mena had said that he "wanted to kill himself."  (*Id*. at 6).

      d.     Plaintiff told officers that during an argument she had with Mr. Mena, he had grabbed a razor, and she had "feared [that] he might use [it] on himself."  She also told officers that "she felt [Mr. Mena] might hurt himself because his mother had committed suicide" and that she became concerned that Mr. Mena was "going to try to harm himself" when he barricaded himself in a room.  (*Id*. at 7).

      e.     A witness to the altercation informed officers that Mr. Mena said he would kill himself if Plaintiff did not come back into the house.  (*Id*. at 14).

23.    Plaintiff did not share any of the information that she provided to officers of the Logan City Police Departments to deputies at the CCJ.  (*See* ECF No. 55-14 at 24:20–25:19).

24.    It is unclear when deputies at the CCJ received a copy of the Logan City Police Department Officer Report and if any deputies at the CCJ ever read it.  (*See* ECF No. 55-9 at 48:21–49:4, 71:24–72:9).

25.    The County does not have a policy that requires deputies at the CCJ to review the probable cause statement, police report, or any other documents or reports that are related to the inmate's arrest or charges.  (*See* ECF No. 64-1 at 92:6–10).  Such review is discouraged by the

CCJ, out of concern that it may prohibit deputies from "deal[ing] impartially with" the inmate. (*See id*. at 92:12–93:15).

26.     The Logan City Transporting Officers did not communicate the information that was contained in the Logan City Police Department Officer Report to Deputy Peterson when they transported Mr. Mena to the CCJ.  (*See* ECF No. 55-3 at 44:10–16, 58:12–59:24).

27.     The County does not have a policy that requires deputies at the CCJ to ask the officers who transport inmates to CCJ about the inmates.  (*See* ECF No. 64-1 at 87:23–88:2).

28.     The CCJ has adopted a number of policies that are relevant to this matter.

29.     Policy CF 30 governs "Screening: Pre-Classification" and sets forth the CCJ's "polices and procedures governing pre-classification screening" of "incoming arrestees, commitments, and other inmates booked into the jail."  (*See* ECF No. 55-4 at ¶¶ CF30/01.01, 02.01).  In relevant part, Policy CF 30:

a.     Recognizes that "[a]s a general rule, CCJ booking deputies know very little about the inmates being admitted to the jail. Pre-classification screening provides a means of obtaining available information" and that "[i]nformation obtained in the pre-classification screening process can aid CCJ officials in caring for and protecting inmates' safety and security during the period from admission to formal classification."  (*Id*. at ¶¶ CF30/02.02 A–B).

b.     Recognizes that "the safe and secure housing of inmates" is "[a] very important responsibility of the CCJ" and that although "it is not possible to guarantee the safety of every inmate received in the jail, pre-classification screening can help reduce the risks to inmates during the initial time that they are in jail."  (*Id*. at ¶ CF30/02.03 A.1).

c.     Recommends as part of the pre-classification screening that booking deputies should "before the transporting officer has left the jail . . . ask the officers questions about

the inmate's demeanor, attitude, and behavior prior to arriving at the jail" to obtain "information regarding the inmate's . . . potential for suicide or other self-destructive behavior."  (*Id*. at ¶ CF30/02.03 C.2).

   d. Recommends that "[s]taff involved in receiving and processing an inmate being admitted to the CCJ should carefully observe the inmate's appearance, behavior, attitude, comments, mental state, scars, and other indicators of the inmate's potential for violence, suicide, disruption, or other management problems" and notes that "[o]bservations should also include injury, illness, and other medical indicators."  (*Id*. at ¶ CF30/02.03 C.3).

   e. Recognizes that "[i]nmates should be interviewed as a part of filling out the intake questions on the Arresting Officer's Information Sheet and Request to Accept Custody form" but that "[j]ail deputies should not treat the screening function as merely the process of completing a booking form," as "[s]creening provides an important opportunity to be proactive in capturing information about the inmate which will be valuable in housing and supervising the inmate."  Instead, "[j]ail deputies should ensure that all details gleaned from transporting officers, observations, and interviews are thoroughly documented on the intake questions form."  (*Id*. at ¶ CF30/02.03 C.4).

   f. Recognizes that "[t]he primary purpose of pre-classification screening is to identify potential serious risks which must be dealt with prior to formal classification. It is necessary that obvious potential risks be discovered so that care can be taken to protect the inmate, other inmates, and staff during the period between admission and formal classification."  (*Id*. at ¶¶ CF30/02.04 A–B).

   30. Policy CF 32 governs "Screening: Self-Destructive Behavior" and sets forth the CCJ's "policies and procedures governing the screening of arrestees/inmates at admission for risk

of self-destructive behavior." (*See* ECF No. 55-5 at ¶ CF32/01.01).  In relevant part, Policy CF 32:

   a.     States that it is the CCJ's policy to "take proactive steps to identify arrestees and/or inmates who are at risk to engage in self-destructive behaviors by . . . screening them in an attempt to determine whether there are obvious factors which would indicate a potential for self-destructive behavior." (*Id*. at ¶ CF32/02.01 A).

   b.     Recognizes that "[s]creening assists in identifying those who present a potential risk to engage in self-destructive behaviors" but that "[s]imply identifying risk is not adequate," so "[o]nce an arrestee or inmate is determined to be at risk to engage in self-destructive behavior, the procedures must be implemented to respond to the perceived risk to protect the inmate from himself." (*Id*. at ¶¶ CF32/02.02 A–B).

   c.     States that it "is the intention of the CCJ officials to attempt to prevent arrestees and/or inmates from engaging in self-destructive behavior by identifying and mitigating risk" and that the purpose of this policy "is to increase the capability and awareness of members to identify arrestees or inmates who are at serious risk to engage in self-destructive behavior." (*Id*. at ¶¶ CF32/02.03 B–C).

   d.     Provides that it "is the policy of the CCJ to screen arrestees and/or inmates as a reasonable means of attempting to identify if there is a substantial risk of self-destructive behavior; conduct screening procedures at both the intake and booking phases; and provide written documentation of the screening." (*Id*. at ¶ CF32/03.01).

   e.     Provides that such screening "will be part of the intake and custody-transfer by obtaining information from the peace officer or other person who transported the arrestee to the jail for booking; and the booking process which provides an opportunity for the deputy to observe

the arrestee, prisoner, or inmate and to ask screening questions which may reveal indications of risk to engage in self-destructive behaviors." (*Id.* at ¶ CF32/03.02 C).

    f.  Sets forth the following procedure for screening for self-destructive behavior:

      i.  "Peace officers and other persons transporting the arrestee to the CCJ should, during the intake process, be requested to provide and document any such observations or other information of which they are aware." (*Id.* at ¶ CF32/03.03).

      ii.  "If the booking deputy observes anything during the intake process which creates a suspicion that the arrestee may have mental problems or is a self-destructive behavior risk, questions should be directed to the peace officer or other person who brought the arrestee to the CCJ to determine the extent of the potential risk of self-destructive behavior by the arrestee." (*Id.* at ¶ CF32/03.04 A).

      iii.  During the booking process, the booking deputy shall closely observe the arrestee for indications of self-destructive behaviors, and to prevent self-destructive acts prior to completion of the evaluation process." (*Id.* at ¶ CF32/03.04 B).

      iv.  "The booking deputy should also complete the information on the "Prisoner Medical Assessment" screen." (*Id.* at ¶ CF32/03.04 C).

      v.  "If the booking deputy's observations or the arrestee's response to any question prompts the need for additional information or inquiry, the deputy should inform medical . . . ." (*Id.* at ¶ CF32/03.04 D).

    g.  Summarizes the roles that CCJ employees should take in conducting screenings for self-destructive behavior as follows:

       i.     "The booking deputy shall form his evaluation of the self-destructive behavior relying upon: the information received from the transporting deputy or officer; his own observations during the pre-admission and admission processes; and other information received." (*Id*. at ¶ CF32/04.05 A).

       ii.     "If the booking deputy determines there is a risk, he shall notify medical and the [officer-in-charge] and initiate the actions required by policy. This may include placing the inmate in a suicide-prevention suit and removing all belongings from the inmate." (*Id*. at ¶ CF32/04.05 B).

       iii.     The medical staff and [officer-in-charge], upon receiving notification, shall review the booking deputy's actions and determine what, if any, additional actions are required." (*Id*. at ¶ CF32/04.05 C).

    31.     Policy CF 33 governs "Screening: Mental Health" and sets forth the CCJ's "policies and procedures governing the mental health screening of inmates during the admission process." (*See* ECF No. 55-7 at ¶ CF33/01.01). In relevant part, Policy CF 33:

    a.     Recognizes that "[t]he CCJ has a duty to treat inmates' serious medical needs, including mental health needs, but before those needs can be treated, the CCJ staff must know the needs exist." (*Id*. at ¶ CF33/02.02 B).

    b.     Sets forth the procedure by which this mental health screening should be conducted:

       i.     "Peace officers, transporting deputies, and other persons transporting prisoners to the CCJ shall provide and document and observations about the arrestee's mental state and other relevant information of which they are aware during the intake process." (*Id*. at ¶ CF33/03.03).

ii. "As a part of the booking process, the inmate will be screened by answering the CCJ mental health screening questions on the Spillman computer system. The CCJ staff and others who are able to observe the inmate should document their mental health-related observations and report them to the CCJ medical staff." (*Id*. at ¶ CF33/03.04). The policy provides a list of factors that a booking deputy should look for during this observation. (*Id*. at ¶ CF33/03.05 B).

iii. "Mental health screening should include two phases" the initial screening and the evaluation. The "initial screening . . . is the basic process of conducting a structured interview using the CCJ mental health screening questions on the Spillman computer system as a guide to the interview." The "evaluation . . . should be handled by a mental health professional. Any inmate for whom the CCJ staff finds reason to believe that there are significant mental health, emotional, or depression problems should be referred to Bear River Mental Health for follow-up." (*Id*. at ¶ CF33/03.05 A).

32. Policy CG 61 governs "Suicide Prevention: Screening" and sets forth the CCJ's "policies and procedures governing detection of inmates experiencing suicide ideation; and evaluation and assessment of suicide risk levels in individual inmates." (*See* ECF No. 55-8 at ¶ CG61/01.01). In relevant part, Policy CG 61:

a. Sets forth that "CCJ deputies shall be provided instruction regarding suicide ideation; reasonable efforts shall be made to identify inmates experiencing suicide reasonable efforts shall be made to identify inmates experiencing suicide ideation; and detecting suicide ideation should include: inquiring of arresting/transporting deputies whether they are aware of information that would indicate that an inmate being delivered to the jail is a potential suicide risk;

observations by CCJ staff; other information received by staff from various sources; and formal suicide screening including asking the inmate if they are suicidal." (*Id*. at ¶ CG61/02.01).

      b.    Sets forth the role that the CCJ deputies play in attempting to determine whether an inmate has suicide ideation:

      i.    "The arresting and transporting deputies have the opportunity to observe and talk with inmates from the time of their initial arrest or other contact in the field continuing on through completion of the intake process at CCJ.  As a result, the arresting/transporting officer may have information not otherwise available to jail staff concerning the inmate's potential for suicide or his need for other mental health or medical intervention." (*Id*. at ¶ CG61/02.04 A).

      ii.    The arresting and/or transporting deputies may gain suicide-related information as a result of: statements made by the inmate, the inmate's family or friends, or other persons at the time of arrest; information acquired regarding the inmate's history during the criminal investigation; comments made by the inmate while being transported to the jail; and/or personal observations and information received from other sources." (*Id*. at ¶ CG61/02.04 B).

      iii.    "Deputies who transport inmates to the CCJ are requested to provide and document any observations or other information regarding suicide risks of which they are aware." (*Id*. at ¶ CG61/02.04 C).

      iv.    "Information received from arresting/transporting deputies should be submitted in writing to the person conducting the formal suicide screening interview." (*Id*. at ¶ CG61/02.04 D).

      c.    Recognizes that information related to an inmate's suicidal ideations "may be volunteered by an inmate's family members, friends, or other persons who suspect an inmate is

potentially suicidal" and that although "[t]here is no requirement that staff initiate routine contact with" these acquaintances, "staff should be receptive to and document information from family and friends of the inmate." (*Id*. at ¶ CG61/02.06 A).

        d.    Recognizes that "[i]nformation may be received from other inmates who observe or become aware of a fellow inmate's possible suicide ideation. As with other sources, information received should be documented in writing and forwarded to the [officer-in-charge] and health care providers for follow up." (*Id*. at ¶ CG61/02.06 B).

        e.    States that it "is the policy of the CCJ that: as a general rule, inmates admitted to the jail should receive suicide screening; staff avoid over-reliance on inmate screening in identifying potential suicide risks; and screening forms shall be forwarded to jail medical staff in a timely manner for appropriate disposition or follow up." (*Id*. at ¶ CG61/03.01).

## DISCUSSION

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(A). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id*. The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

Plaintiff's action against the County asserts that it is liable for Mr. Mena's death under 42 U.S.C. § 1983 (the "1983 Claim") and under a wrongful death theory (the "Wrongful Death Claim")[1].  The County argues that it is entitled to summary judgment on both claims.

## I. The County is entitled to summary judgment on Plaintiff's § 1983 Claim.

Plaintiff's first cause of action is brought under 42 U.S.C. § 1983 and asserts that the County violated Mr. Mena's rights: 1) under the Eight and Fourteenth Amendments to the U.S. Constitution to be free from cruel and unusual punishment by failing to "provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of inmates" and 2) under the Utah Constitution by treating him with unnecessary rigor.  (*See* Amended Complaint, ECF No. 40, at ¶¶ 25–35).

### A. THE COUNTY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM THAT IT VIOLATED MR. MENA'S RIGHTS UNDER THE U.S. CONSTITUTION.

The Tenth Circuit has recognized that to "establish a claim for damages under § 1983 against municipal entities or local government bodies, the plaintiff must prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights.  That is, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009) (internal quotations and citations omitted; quote cleaned up).  Liability may also exist for an act that is "performed pursuant to a 'custom,'" even though the action "has not been formally approved by an appropriate decisionmaker," if it "is so widespread as to have the force of law."  *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403–04 (1997) (internal quotations and citations omitted).  But it is not enough "for a § 1983 plaintiff merely to identify conduct properly attributable to the

---

[1] At the April 30, 2021 hearing on the County's Motion, Plaintiff's counsel indicated, but did not definitively state, that Plaintiff was no longer pursuing her Wrongful Death Claim.  Because the claim has not been expressly withdrawn or dismissed, the court will analyze it herein.

municipality," rather she "must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged" and "that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id*.

Plaintiff's § 1983 claim alleges that the County violated Mr. Mena's Eighth Amendment rights by failing to prevent his suicide.  The Tenth Circuit has recognized that such "[c]laims arising from a failure to prevent a prisoner suicide 'are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody.'" *Bame v. Iron Cty.*, 566 F. App'x 731, 738 (10th Cir. 2014) (citation omitted).  To prevail on such a claim, Plaintiff must show that the County was "'deliberately indifferent to a substantial risk of suicide.'" *Id*. (citations omitted).  Reading these standards together, to prevail on her § 1983 Claim, Plaintiff must establish that the County deliberately executed a policy or custom that was indifferent to Mr. Mena's risk of suicide and that this policy or custom was the "moving force" behind Mr. Mena's suicide.  Plaintiff has failed to make such a showing here.

Plaintiff points to numerous allegations that she claims establish the County violated Mr. Mena's constitutional rights, but only one actually involves a policy or custom allegedly adopted by the County.[2]  Plaintiff asserts that the County had adopted an official policy to not review police

---

[2]  One of Plaintiff's primary arguments raised in opposition to the County's Motion is that the County violated Mr. Mena's rights by failing "to follow the few sufficient policies they had implemented in their ordinary course of practice," noting that there is a "clear disconnect between the [County's] policies as written and the practices as implemented." (*See* ECF No. 64 at 32–33).  Plaintiff also reiterates, verbatim, seven assertions that she made in her Amended Complaint regarding allegedly violative actions taken by the County.  (*See* ECF No. 64 at 28–29; *see also* Amend. Compl., ECF No. 40).  None of these assertions involves an alleged policy or custom executed by the County.  Rather, each appears to be an attempt to hold the County liable on a theory of *respondeat superior*.  Such liability is impermissible.  *See Moss*, 559 F.3d at 1168.  To the extent that Plaintiff wishes to assert that the complained of actions were so systemic that they amounted to official customs, she has failed to make that argument, and the materials before the court, even when read in the light most favorable to Plaintiff, do not allow the court to reach such a conclusion. Further, as discussed herein, Plaintiff cannot establish that any of these actions were taken by the County with "deliberate indifference."

reports, and that this policy led to Mr. Mena's death (the "Alleged Policy").  Specifically, Plaintiff asserts that "it is Defendant's affirmative policy that jail personnel are discouraged from reviewing the arresting officer's probable cause statement, the police report, or any other documentation relating to the incident for which the new inmate is being placed in Defendant's custody" and that "the record is clear that, but for [the Alleged Policy], Mr. Mena would have properly been identified as a potential suicide risk, and Defendant would have taken proper additional steps to ensure that Mr. Mena remained safe during his confinement at Cache County Jail."  (ECF No. 64 at 29–30).

Even if it is assumed that the County's Alleged Policy to ignore documentation relating to an inmate's arrest was so widespread and permanent that it could constitute a custom with the force of law, (*see Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)), Plaintiff cannot show that the County adopted that policy with "deliberate indifference" to the risk of Mr. Mena's suicide.  "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Bryson*, 627 F.3d at 789.  Such notice "can be established by proving the existence of a pattern of tortious conduct" or, more rarely, it can be found "absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction."  *Id*.  A plaintiff must "present evidence of the prison official's state of mind" and must show that "the official knows of and disregards an excessive risk to inmate health or safety.  It is not enough for an official to merely be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; rather, the official must also draw the inference." *Ernst v. Creek Cty. Pub. Facilities Auth.*, 697 F. App'x 931, 933–34 (10th

Cir. 2017) (internal citations and quotations omitted; quote cleaned up).  Plaintiff cannot make such a showing here.

The undisputed facts show that the County took seriously the risk of inmate suicide.  As discussed above, the County recognized the serious risk that inmate self-harm presented and adopted numerous policies that were focused on screening for, identifying, and minimizing the risk of, suicidal ideations.  (*See e.g.*, ECF Nos. 55-4, 55-5, 55-7, 55-8).  While Plaintiff may reasonably believe that the County should have done more to prevent the risk of suicide, based on the record before it, the court finds that Plaintiff cannot, as a matter of law, show that County officials knew of and "consciously or deliberately" disregarded the risk that suicide posed to inmate health.  *See Bryson*, 627 F.3d at 789.

Further, the undisputed facts show that the County had no knowledge of Mr. Mena's risk of suicide and that nothing occurred during the approximately two weeks that Mr. Mena spent in the CCJ that indicated that he was suicidal.  Deputy Peterson did not learn that Mr. Mena was suicidal during his initial intake.  (*See* ECF No. 55-3 at 44:10–16).  Deputy Atwood spoke with Mr. Mena during his booking and found that he "seemed fairly happy for his circumstances," and he did not identify any signs of depression, fatalistic comments, anxiety or fear, anger, or information concerning serious personal problems.  (*See* ECF No. 55-9 at 26:22–27:9, 45:6–25). None of the CCJ deputies who worked in Mr. Mena's area while he was incarcerated observed any signs that indicated that Mr. Mena was experiencing depression or was likely to harm himself. (*See* ECF No. 55 at 12, ¶ 56; ECF No. 64 at 15–16, ¶ 56).  CCJ Deputies similarly did not receive any such information from Mr. Mena's family.  Plaintiff never shared with them any of the information that she provided to officers of the Logan City Police Department regarding Mr. Mena's suicidal threats.  (*See* ECF No. 55-14 at 24:20–25:19).  While Plaintiff testified that during

telephone calls she had with Mr. Mena while he was incarcerated, he reported being depressed and that harming himself had "cross[ed] his mind," although he never said he intended to do so. (*See* ECF No. 55-14 at 12:14–21, 16:4–15, 25:23–26:2). Plaintiff did not believe that Mr. Mena would harm himself, and she never reported any of this information to the County. (*Id.* at 26:9–18, 12:14–21). Mr. Mena's brother, Francisco, also spoke with Mr. Mena approximately three times while he was incarcerated and, although he recognized in one call that Mr. Mena seemed depressed, he did not have any concerns that Mr. Mena was going to harm himself and did not raise any concerns with the County. (*See* ECF No 55-20 at 12:24–16:13). Because the County did not know that Mr. Mena was potentially suicidal, it is difficult for Plaintiff to establish that County officials knew of and disregarded "an excessive risk to [his] health or safety." *Ernst*, 697 F. App'x at 933–34; *see also Heidel v. Mazzola*, 2021 WL 1103507 at *3 (10th Cir. Mar. 23, 2021) (recognizing that "subjective awareness" of an inmate's risk of suicide was necessary in order to "establish an underlying constitutional violation").

Because Plaintiff cannot show that the County executed its Alleged Policy of ignoring documentation relating to an inmate's arrest with deliberate indifference, that Alleged Policy does not support a claim under § 1983. The County is therefore **ENTITLED TO SUMMARY JUDGMENT** on Plaintiff's claim that it violated Mr. Mena's rights under the Eight and Fourteenth Amendments to the U.S. Constitution.

## B. THE COUNTY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM THAT IT VIOLATED MR. MENA'S RIGHTS UNDER THE UTAH CONSTITUTION.

The Utah Constitution provides that "*[p]ersons arrested or imprisoned shall not be treated with* unnecessary *rigor*." Utah Const. art. I, § 9. The clause has been interpreted as prohibiting "'needlessly harsh, degrading, or dehumanizing' treatment of prisoners" and "unnecessary abuse." *See Dexter v. Bosko*, 2008 UT 29, ¶ 8, 184 P.3d 592, 595 (citations omitted). "A prisoner suffers

from unnecessary rigor when subject to unreasonably harsh, strict, or severe treatment.  This may include being unnecessarily exposed to an increased risk of serious harm." *Id*. at ¶ 19.  "[A] violation of the prohibition on unnecessary rigor must arise from 'treatment that is clearly excessive or deficient and unjustified, not merely the frustrations, inconveniences, and irritations that are common to prison life.'  When the claim of unnecessary rigor arises from an injury, a constitutional violation is made out only when the act complained of presented a substantial risk of serious injury for which there was no reasonable justification at the time." *Id*.

Plaintiff alleges that the County violated Mr. Mena's rights in nine distinct ways.  (*See* ECF No. 64 at 28–29).  Even if for purposes of the County's Motion, each of these allegations is accepted as true, none of the County's alleged actions constitutes "unnecessary abuse," "needlessly harsh, degrading, or dehumanizing treatment of prisoners," or "unreasonably harsh, strict, or severe treatment." *Dexter*, 2008 UT 29 at ¶¶ 8, 19.  The treatment of which Plaintiff complains arises from the "frustrations, inconveniences, and irritations that are common to prison life" and does not arise to the level of "clearly excessive, [] deficient[,] and unjustified" treatment that the unnecessary rigor clause of the Utah Constitution was adopted to prohibit. *Id*.  The County is therefore **ENTITLED TO SUMMARY JUDGMENT** on Plaintiff's claim that it violated Mr. Mena's rights under the Utah Constitution.

## II.  The County is Immune from Plaintiff's Wrongful Death Claim.

The County argues that it is immune from Plaintiff's Wrongful Death Claim pursuant to Utah Code § 63G-7-201(4)(j) (the "GIA").  In relevant part, that section, when read together with Utah Code § 63G-7-101(2), provides that "governmental entities" have immunity to "all claims" against them "for any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment, if the injury arises out of or in connection with, or

results from . . . the incarceration of a person in a state prison, county or city jail, or other place of legal confinement."

Plaintiff contests that this provision does not apply the Mr. Mena's death, as the undisputed facts do not make it "clear that the injury resulting from [the County's] negligent conduct arose 'out of or in connection with or results from . . . the incarceration of a person in a state prison, county, or city jail, or other place of legal confinement.'"  (*See* ECF No. 64 at 24–25).  But the Utah Supreme Court has recognized that the GIA, and specifically "the phrase 'arising out of,' should be interpreted broadly so that immunity is 'strictly applied to preserve sovereign immunity.'"  *York v. Julian*, No. 2:97-cv-651, 2000 WL 33710899, at *7 (D. Utah Aug. 2, 2000) (quoting *Taylor v. Ogden City School District*, 927 P.2d 159, 162 (Utah 1996)).

Here, the undisputed facts show that Mr. Mena was incarcerated in the CCJ when he committed suicide.  Interpreting the phrase "arising out of" broadly, as it must, the court finds that there is a "clear causal link between his injury and his incarceration" and that "[a]ccordingly, his injury arose out of his incarceration."  *Peck v. State*, 2008 UT 39, ¶ 17, 191 P.3d 4, 8; *see Madsen v. State*, 583 P.2d 92, 93 (Utah 1978) (recognizing that "[t]he plain meaning of [Utah Code § 63G-7-201(4)(j)][3] reflects a legislative intent to retain sovereign immunity for any injuries occurring while the incarcerated person is in prison and under the control of the State" (citation omitted)).  Utah Code § 63G-7-201(4)(j) governs Plaintiff's Wrongful Death Claim.

To determine whether that provision grants the County immunity from Plaintiff's Wrongful Death claim, the court applies a three-part test in which it assess: "'(1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived

---

[3] While the *Madsen* case analyzed a prior version of the GIA, the relevant language is substantively the same as that which is now found in Utah Code § 63G-7-201(4)(j).

for the particular activity; and (3) whether there is an exception to that waiver.'" *Conner v. Dep't of Commerce*, 2019 UT App 91, ¶ 8, 443 P.3d 1250, 1256.

The GIA defines "governmental function" as "each activity, undertaking, or operation of a governmental entity," which "includes each activity, undertaking, or operation performed by a department, agency, employee, agent, or officer of a governmental entity" as well as "a governmental entity's failure to act." UTAH CODE § 63G-7-102(5).  Here, the undisputed facts show that Mr. Mena died while incarcerated in the Cache County Jail.  Housing incarcerated inmates is an undertaking or operation of the County and is therefore a governmental function under the GIA.

As for the second prong, the County has not waived its immunity for these activities.  To the contrary, the GIA makes it clear that immunity has specifically been retained for the type of injury that underlies Plaintiff's Wrongful Death Claim.  Because there is no waiver of immunity here, the third factor, whether "an exception to that waiver" exists, does not apply.  *See Conner*, 2019 UT App 91 at ¶ 8.

Under Utah Code § 63G-7-201(4)(j), the County is immune from Plaintiff's Wrongful Death Claim.  *See Pace v. St. George City Police Dep't*, 2006 UT App 494, ¶¶ 7–8, 153 P.3d 789, 791.  The County is therefore **ENTITLED TO SUMMARY JUDGMENT** on Plaintiff's Wrongful Death Claim.

## <u>CONCLUSION</u>

For the reasons stated above, the County is entitled to **SUMMARY JUDGMENT** on both of Plaintiff's claims against it.

DATED this 4th day of May, 2021.

BY THE COURT:

Clark Waddoups
United States District Judge